1
2
3
4
5                    UNITED STATES DISTRICT COURT
6                  NORTHERN DISTRICT OF CALIFORNIA
7
8   LARRY LIONEL WHITE,                    No. C 10-4555 SI (pr)
9              Petitioner,                 **ORDER DENYING PETITION FOR
                                           WRIT OF HABEAS CORPUS AND
10       v.                                DENYING CERTIFICATE OF
                                           APPEALABILITY**
11  B. M. CASH, warden,
                                           (Docket no. 63)
12              Respondent.
                                        /
13
14                            **INTRODUCTION**
15          Larry Lionel White, a prisoner at the California State Prison in Lancaster, filed a petition
16  for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 2008 conviction in San
17  Francisco County Superior Court on several counts of kidnapping and rape, for which he was
18  sentenced to fifty years to life in prison.  The court dismissed some claims as non-cognizable in
19  federal habeas corpus, and White elected to dismiss unexhausted claims.  Respondent  filed an
20  answer addressing White's remaining three claims.  White filed a traverse.  For the reasons
21  discussed below, the petition for writ of habeas corpus is DENIED.[1]
22
23                             **BACKGROUND**
24          On December 7, 2007, an information was filed in San Francisco County Superior Court
25  accusing White of kidnapping for purposes of rape (counts 1 and 3, Cal. Penal Code § 2091);
26  rape (counts 2 and 4, Cal. Penal Code § 261); and kidnapping to commit robbery (count 5, Cal.
27  Penal Code § 209).  Great bodily injury was alleged under California Penal Code section
28

_____

[1]White's motion for an expedited ruling on the merits of his case is DENIED as moot.
Docket no. 63.

12022.7 as to counts 1, 3 and 5, and under section 667.61 as to counts 2, 4 and 5. An allegation of kidnapping was alleged under section 667.61 as to counts 2 and 4, and an allegation of multiple victims was alleged under section 667.61 as to counts 2 and 4. Resp't Exh. H, 1 CT 115.[2]

On March 5, 2008, the jury found White guilty on all counts, and found all allegations of aggravating circumstances to be true except for the great bodily injury allegations attached to counts 1 and 2. Exh. H, 2 CT 349-57. Those counts were dismissed on the motion of the prosecutor. Exh. G, 19 RT 1067, 1071. White was sentenced to twenty-five years to life in state prison on count 4, and to a consecutive term of twenty-five years to life on count 2, both pursuant to section 667.61, the "One Strike Law". The court added a concurrent term of life in state prison plus three years on count 5. The sentences on counts 1 and 3 were stayed pursuant to California Penal Code section 654. Exh. H, 2 CT 422-23.

The conviction was affirmed on appeal and the California Supreme Court denied review. Exhs. D, E. White filed a petition for writ of habeas corpus in the California Supreme Court; the petition was denied summarily, without citation or comment. Exh. F. White then filed the instant petition, which proceeds on the following claims: (1) the rape charges were brought outside of the applicable state statute of limitations and, therefore, violate federal constitutional ex post facto principles, (2) prosecutorial misconduct based on the destruction of evidence, and (3) insufficient evidence to sustain the jury's findings that White kidnapped one of the victims.

The following statement of facts is taken from respondent's summary of the evidence presented at White's trial.[3]

---

[2]Hereinafter, all referenced exhibits are those lodged by respondent in support of the answer to the petition, unless otherwise noted. White has objected to respondent's recent lodging of the reporter's transcript (Exh. G) and the clerk's transcript (Exh. H) from White's state criminal proceedings. The objection is unwarranted. Under Rule 5 of the Rules Governing Section 2254 Cases, the exhibits should have been lodged previously, when the answer was filed. Because they were not, the court recently requested that respondent's counsel lodge them with the court.

[3]Because only one of White's claims was before the California Court of Appeal on direct appeal, that court's opinion does not discuss all of the facts relevant to the three claims raised in the instant petition.

1    <u>Victim Cheryl P.</u>

2         <u>January 26, 1998</u>

3         At about 8:00 p.m. on January 26, 1998, Cheryl P., then 35 years of age, was walking

4    near Market Street in San Francisco. Exh. G, 10 RT 380-81, 383. She had just visited a cousin

5    at the local police station, and was heading to a shelter for the night. She heard someone come

6    up from behind her and ask her for a cigarette. When she said she did not have one, the person,

7    whom she identified as White, struck her in the back of the neck with an open hand. Exh. G, 10

8    RT 384-85. Dazed, Cheryl P. stumbled, and White said that she had better come with him or

9    that he would kill her. Exh. G, 10 RT 384-85. She was scared and did not feel free to leave, so

10   she went with him. Exh. G, 10 RT 385-86. They walked south of Market Street, to a vacant lot

11   near Seventh and Harrison Streets. The lot was next to an old carwash and was vacant, although

12   at the time of trial it was being used for parking for police cars. Exh. G, 10 RT 385-86. The lot

13   was under a freeway and surrounded by a fence that was about four feet high. Exh. G, 10 RT

14   387-88. White told Cheryl P. to climb over the fence, and he helped push her over. Exh. G, 10

15   RT 388-89.

16        Once secreted in the lot, White tried to take Cheryl P.'s clothes off; when Cheryl P.

17   resisted, White struck her in the face twice. Exh. G, 10 RT 389. Cheryl P., who was very angry,

18   fell to the ground, semi-conscious. White beat her face into the concrete. Exh. G, 10 RT 390.

19   As Cheryl P. passed out, White started to take her pants off. Exh. G, 10 RT 390-91. When she

20   came to, White was on top of her and had penetrated her. Cheryl P. was fighting him off, but

21   White beat her more. Exh. G, 10 RT 391. White put his hand on her mouth to quiet her, and she

22   bit his hand. She felt White ejaculate inside her. Exh. G, 10 RT 394.

23        After White left, Cheryl P. found her clothes, although not her underwear. Exh. G, 10

24   RT 392, 395. She walked, crying, back towards Market Street. Exh. G, 10 RT 395. She felt

25   dirty, nasty, angry and woozy. She ran into a man who helped her and put whiskey on her cuts.

26   She then went to the police station, arriving fifteen to twenty-five minutes after the rape. Exh.

27   G, 10 RT 396-97. After she gave a report, the officers wanted to take her to the hospital, but she

28   was too angry and just wanted to find her boyfriend to come back and "hurt" White. Exh. G,

10 RT 397.  She left the station and went home.  Exh. G, 10 RT 399.

San Francisco Police Officer Cliff Chiu testified that at about 8:30 p.m. on January 26, 1998, he went to the Tenderloin Police Station and met with Cheryl P.  Exh. G, 9 RT 249-53. She was scared and looked like something had happened to her.  She had a cut near her left eyebrow and on her left elbow.  She said she had been raped.  Exh. G, 9 RT 253.  She described her assailant as a black male, in his thirties, about 5'11" tall, weighing 180 pounds, and wearing a black jacket with a black and white sweater and black pants.  Exh. G, 9 RT 254.  Cheryl P. declined an offer to take her to the hospital or to look for the suspect, saying she just wanted to find her boyfriend.  Exh. G, 9 RT 254-55.

January 27, 1998

The day after the rape, Cheryl P. went to San Francisco General Hospital for treatment. Exh. G, 10 RT 399.  San Francisco General Hospital registered nurse Patricia Mitchnick testified that she had been a rape treatment nurse for twenty years.  Exh. G, 9 RT 287-89.  She qualified as an expert on female sexual assault treatment.  Exh. G, 9 RT 292-93.  On January 27, 1998, she examined Cheryl P., who said she had been sexually assaulted the previous evening.  Exh. G, 9 RT 294-95.  Cheryl P. had a laceration above her eye, bruising and scratches on her cheek, and a bruise on her ribs.  Exh. G, 9 RT 299.  She had a three millimeter laceration between "five o'clock and six o'clock" on her posterior fourchette.[4]  Exh. G, 9 RT 300-01.  The posterior fourchette is the most likely place to find an injury as a result of a sexual assault.  Exh. G, 9 RT 320.  Nurse Mitchnick testified that she has examined around 1100 rape victims, and did not know if she had ever found such an injury on a woman who was not reporting a sexual assault. Exh. G, 9 RT 335-36, 291.  A rape kit was created, including swabs of Cheryl P.'s vagina.

March 28, 1998

Two months later, on March 28, 1998, in the late evening, Cheryl P. was at Golden Gate Avenue and Jones Street when she turned and saw White.  Exh. G, 10 RT 400-01.  She said to White that he was the guy who raped her, and White said that she had better shut up or he would

---

[4]The fourchette is a small fold of membrane connecting the labia minora in the posterior part of the vulva.  http://www.merriam-webster.com.

kill her. Exh. G, 10 RT 401-402. As Cheryl P. called 911, White ran away. Exh. G, 10 RT 402. A police car arrived and Cheryl P. got in and directed the officer until they spotted White around Seventh and Market Street. Officers got out and arrested White. Exh. G, 10 RT 403-04, 406.

San Francisco Police Officer Steve Griffin testified that, on March 28, 1998, he met Cheryl P., who was excited and said she had just seen the person who had raped her. Exh. G, 9 RT 265-69. As they drove in his car, she shouted "that's the man who raped me." Exh. G, 9 RT 269. Officer Griffin arrested the man, who was White. Exh. G, 9 RT 270. White was 5'10" inches tall, weighed 180 pounds and was about forty years old. Exh. G, 9 RT 278.

<u>Victim Kei C.</u>

Kei C., who was flown in from Japan for her testimony, testified through an interpreter. She stated that on December 14, 1998, when she was twenty-one years old, she was in the United States on a sight-seeing trip. Exh. G, 11 RT 483-86. She had been staying in a youth hostel in San Francisco for two weeks, but traveled to the airport to leave for Los Angeles that day. Exh. G, 11 RT 486. She was carrying a very large backpack with all of her belongings. At the airport she changed her mind and came back to see a man she had met at the hostel. Exh. G, 11 RT 487. She got back at midnight, but it was too late to stay at the hostel. Exh. G, 11 RT 487-88. Her backpack was too heavy to keep looking for lodging, so she sat up against a building at Market and Kearny Streets, and planned to sit there until daybreak. Exh. G, 11 RT 488. She testified that in Japan it is safe to sleep on the street, and an incident like this one would not happen there. Exh. G, 11 RT 489.

At around 2:00 a.m., as she sat against the building with her arms around her knees, there were few people passing, little traffic, and not much lighting. Exh. G, 11 RT 490-91. She had her eyes closed when she felt a tap on her shoulder. She looked up and saw a black man who acted drunk. The man left, but then came back with another black man, who eventually raped her. Exh. G, 11 RT 491-92. That man, eventually identified by DNA evidence as White, asked her if she was going to sleep the night where she was. When Kei C. said yes, White said it was dangerous to do so and that she should come to his place. Exh. G, 11 RT 493. Kei C. said no. At first, White's voice was kind, but as he repeatedly told her to come with him, "his tone was

becoming strong . . . ."  Exh. G, 11 RT 494.  Kei C. repeatedly said that she did not want to go with him.  After numerous refusals, the man "grabbed my arm with a little strength in it and it's like he was pulling my arm and told me to come."  Exh. G, 11 RT 494.  Kei C. testified that when White pulled her arm, it "was like I was being pulled and it was like I was made to stand up."  Exh. G, 11 RT 494.  Kei C. followed White as he walked away because "I was very scared and I felt I couldn't do anything, so for the time being I thought I should just listen to him and I would just do what he told me to do because I was very scared."  Exh. G, 11 RT 495.  The other man was still there as well.

The three walked, and after five or ten minutes the other man left.  Kei C. thought of running away, but her backpack was heavy, and she believed that even if she ran White would catch her.  Exh. G, 11 RT 495-96.  After walking a few feet behind White for twenty or thirty minutes, they came to darker, narrower streets with no one passing by.  Exh. G, 11 RT 496.  Kei C. stressed that she continued to walk because "I was very scared.  And even if I tried to run away, well, I felt I couldn't run away."  Exh. G, 11 RT 497.  White led her to the back of a parking lot that was surrounded by a metal wire fence.  Exh. G, 11 RT 497.  He spread out newspapers and repeatedly told her to sit; Kei C. refused.  Exh. G, 11 RT 500-01.  Finally, after White's voice became strong, she felt she had no choice, and White pushed her to the ground by her shoulder.  Exh. G, 11 RT 501-02.  She screamed and cried out, very fearful, but White told her to be quiet and punched her in the face many times with a closed fist.  Exh. G, 11 RT 503-04.  As a result, her eyes were bruised and her nose was broken.  Exh. G, 11 RT 504.

White sat on Kei C.'s lower half and, when she continued to resist, he grabbed her head and hit it on the concrete many times.  Exh. G, 11 RT 505.  Kei C. eventually lost strength, and White took off her pants and underwear.  Exh. G, 11 RT 506.  He took out his penis and tried to put it in her vagina, but it was not erect so he could not.  He told Kei C. to put it in her vagina, and she did not want to but she did so.  While he was penetrating her, White kissed her two or three times.  Exh. G, 11 RT 506.  He also continued to punch her with a closed fist.  Exh. G, 11 RT 507.  After about one or two minutes, Kei C. believed White ejaculated.  He then wiped himself with her underwear, and started to rummage in her backpack.  Exh. G, 11 RT 507-08.

1  White took Kei C.'s Walkman, dollars and yen, traveler's checks, airplane ticket, driver's license

2  and passport. Exh. G, 11 RT 510.  As he walked away, he told her not to move or she would be

3  killed.  He hid one of her shoes in a plant and left.  Exh. G, 11 RT 510.

4       Kei C. put on her underwear and clothes and backpack and walked away, afraid White

5  would return. Exh. G, 11 RT 511.  When she got to Market Street, she found a man and told him

6  she had been raped.  The man went to a pay phone and called police. Exh. G, 11 RT 513.  When

7  a Japanese-speaking officer was summoned, Kei C. gave a description. Exh. G, 11 RT 514.  She

8  was in the hospital for two days. Exh. G, 11 RT 521.   From the time White first grabbed her

9  arm on Market Street until the time he left in the parking lot, she did not feel that she was free

10  to leave.  Exh. G, 12 RT 555.

11       San Francisco Police Officer Keita Moriwaki testified that at about 3:00 a.m. on

12  December 14, 1998, he spoke to Kei C. when she was in an ambulance. Exh. G, 11 RT 464-70.

13  He was called because of his ability to speak Japanese. Exh. G, 11 RT 467.  Kei C. told him that

14  she was sleeping at Market and Kearny Streets when she was approached by a black man who

15  walked her to a parking lot and raped her. Exh. G, 11 RT 470.  She told him that the suspect was

16  160 centimeters, or about 5'2" tall, and 55 kilos, about 121 pounds.  Exh. G, 11 RT 475.

17       Registered Nurse Carmen Henesy qualified as an expert on female sexual assault.  Exh.

18  G, 12 RT 561.  She examined Kei C. at the San Francisco Rape Treatment Center on December

19  15, 1998.  Exh. G, 12 RT 561, 564, 566.  Kei C. had large areas of bruising around her eyes and

20  an extremely swollen nose.  Exh. G, 12 RT 570.  She had bruises on her arms, back and legs.

21  Exh. G, 12 RT 575-78.  There was a laceration on her posterior fourchette.  Exh. G, 12 RT 579.

22  A sexual assault kit was taken, including vaginal swabs.  Exh. G, 12 RT 590.

23       Retired San Francisco Police Officer Donald O'Connor testified that he showed Kei C.

24  a photo spread that did not include White, and she did not pick anyone out.  Exh. G, 14 RT 668-

25  69, 671-82.

26  Investigations

27       Retired San Francisco Police Officer William Kidd testified that he was assigned to the

28  Cheryl P. case in January 1998.  Exh. G, 13 RT 629-31.  He was unable to find the victim at that

7

time, but talked to her after she assisted in White's arrest on March 28, 1998.  Exh. G, 13 RT 632-33.  White was released without charges, but an oral reference swab was taken from him. Exh. G, 13 RT 634.  Officer Kidd sent the DNA retrieved from Cheryl P. and the reference sample from White to the crime lab, requesting comparison.  When he received no response, he made a second request in June 1998.  Exh. G, 13 RT 638.  For reasons not explained in the record, no test of the samples was done for several years; Officer Kidd did not receive the results until August 2003.  Exh. G, 13 RT 640-41.  He then retired before any further action was taken. Exh. G, 13 RT 642.

San Francisco Police Inspector Pamela Hofsass testified as an expert in DNA typing and analysis.  Exh. G, 14 RT 685.  In February 1999, she analyzed the materials in Kei C.'s sexual assault kit.  In particular, she analyzed DNA from sperm found on Kei C.'s underwear and DNA from Kei C.'s reference sample.  Exh. G, 14 RT 720-28.  The DNA did not match any individual in the databases to which it was compared.  Exh. G, 14 RT 713-14, 15 RT 799.

In June 2003, pursuant to a grant allowing retesting of "cold case" information, Inspector Hofsass compared the DNA taken from Cheryl P. to White's 1998 oral reference sample.  Exh. G, 14 RT 750, 15 RT 798.  The samples were a conclusive match.  Inspector Hofsass entered White's reference sample into the in-house San Francisco database and found that it also matched the sperm sample collected from Kei C..  Exh. G, 15 RT 805.

Former San Francisco Police Officer Peter Siragusa was assigned to both cases in 2005. Exh. G, 13 RT 611-13.  After contacting Cheryl P. and learning that White had been arrested in 1998, Officer Siragusa obtained an arrest warrant for White.  Exh. G, 13 RT 613-15.  He arrested White in April 2006.  Exh. G, 13 RT 615-18.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over the petition for writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction occurred in San Francisco County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  28 U.S.C. § 2254(b), (c).  State judicial remedies have been exhausted for the claims addressed in this order.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A

federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

Where constitutional error is found, habeas relief is warranted only if the error at issue had a "substantial and injurious effect on the verdict." Penry v. Johnson, 532 U.S. 782, 796 (2001) (citation omitted).

**DISCUSSION**

A.     Ex Post Facto Violation

White argues that his prosecution on rape counts 2 and 4 violated the California statute of limitations and, therefore, federal constitutional ex post facto principles.

1.     Background

As noted above, the crimes for which White was convicted occurred in 1998. An arrest warrant was issued in 2005 and a criminal complaint was filed in 2006. Exh. H, 1 CT 1. White was charged with two counts of rape in violation of California Penal Code section 261, under which the maximum punishment for rape is eight years in state prison. Cal. Penal Code § 264. California Penal Code section 800 provides that, "[e]xcept as provided in Section 799, prosecution for an offense punishable by imprisonment in the state prison for eight years or more . . . shall be commenced within six years after commission of the offense." Cal. Penal Code § 800. Thus, if the rapes with which White was charged were punishable "by imprisonment in the state prison for eight years or more," his prosecution must have commenced by no later than 2004.

Under California Penal Code section 667.61, also referred to as the "One Strike Law," a defendant who is convicted of specific crimes *shall* receive a life term if certain aggravating circumstances are found to exist. In particular, a defendant convicted of rape under two or more

of the aggravating circumstances listed in section 667.61(e) "shall be punished by imprisonment in the state prison for 25 years to life."  Cal. Penal Code § 667.61(a).  California Penal Code section 799 provides that "prosecution for an offense punishable by death or by imprisonment in the state prison for life . . . may be commenced at anytime."  Cal. Penal Code § 799.

In the present case, it was alleged in the information that, under sections 667.1(e)(1), (3) and (5) of the One Strike Law, the rapes charged in counts 2 and 4 occurred under aggravated circumstances that included kidnapping, infliction of great bodily injury, and more than one victim.  Exh. H, 1 CT 116-17.  Thus, if the aggravating circumstances with which White was charged were found to exist, the rapes would be punishable "by imprisonment in the state prison for 25 years to life," and his prosecution could be commenced at any time.

Before trial, the trial court discussed the possibility that the two rape counts were barred by the statute of limitations.  The court noted, however, that the applicable statute of limitations was dependent on the jury's findings on the additional allegations under section 667.61, and that the court would have to "deal with that if, at any point during the trial, those allegations are either dismissed or found not to be sustained or not found by the jury."  Exh. G, 5 RT 42.  Later, during the colloquy with counsel on jury instructions, the trial court made the following observation:

> [T]he statute of limitations issue, which is something – a separate issue that we need to talk about.  I'll be breaking momentarily and meeting with counsel in chambers informally to go over the proposed jury instructions, but I wanted to clarify on the record before we broke, now[,] that my perception of the statute of limitations issue is that there is not a contested issue of fact as to the time period involved from when the incidents are alleged to have occurred and when the charges were brought and that, in any calendaring system, that is beyond six years.
>
> Because I don't perceive that there's any contested issue of fact about the timing relating to the statute, it's my understanding and perception that the case goes to the jury without a statute of limitations instruction to the jury because it's not a contested factual issue for the jury.  That if the jury, in their findings about the different charges and allegations, if they were to, for example, find not true several of the allegations, the net effect of those allegations, if those were found to be not true, is that for some of the offenses charged here they would, as a matter of law, then not have been brought within the necessary statue of limitations and the Court would have to dismiss, as a matter of law, those charges.

Exh. G, 16 RT 969:7-970:1.

The prosecutor and defense counsel both agreed with the court's analysis of the

1  applicable law and the court ruled that the question whether prosecution of the rapes had been

2  commenced within the statute of limitations would not go to the jury.  Exh. G, 16 RT at 970:2-

3  15.

4          The jury convicted White of rape on counts 2 and 4, and found all of the aggravating

5  circumstances alleged under section 667.61(e)  with respect to those counts to be true, with the

6  exception of great bodily injury on count 2.  Exh. G, 2 CT 349-57.  Consequently, under section

7  667.61(a), White was sentenced to twenty-five years to life in prison on count 4 and to a

8  consecutive term of twenty-five years to life in prison on count 2.

9          In a motion for new trial, White's counsel argued that the two rape counts should be

10  stricken because they were brought outside of the applicable limitations period.  In particular,

11  he argued that a conviction of rape under section 261 is a prerequisite to invoking the alternative

12  sentencing scheme of section 667.61; thus, because the jury cannot arrive at a verdict on the

13  aggravating circumstances applicable to a rape conviction until it has reached a verdict on the

14  charge of rape, the applicable statute of limitations for the rapes must be the six-year period of

15  section 800.  Exh. G, 22 RT 1088:10-1090:4.  The trial court denied the motion, ruling as

16  follows:

17          With regard to the statute of limitations' argument, it is an issue that was raised
18  early in the case as we were starting the trial, and then the issue was deferred until after
   the trial. The Court's view, expressed at the time, was that the six-year period of time for
19  the running of the statute of limitations, that that would, essentially, prevent a conviction
   from being able to stand with regard to the rape count if and only if the allegations that
20  were made to the rape counts – and those were the allegations made under 667.61, several
   subsections, only if those allegations were found not to be true by the jury.  The Court's
21  view before the trial, during the trial, and this continues to be the view of the Court after
   reviewing all of these moving and opposing papers, is that the allegations under 667.61,
22  because they were found true by the jury, do make the potential sentencing for the rape
   counts life in prison.

23          Because the penalty can become a life-in-prison penalty, the Court's view that the
   statute of limitations, the six-year limitation on it is no longer at issue and is no longer
24  controlling.  Had the jury found those allegations not true, the Court would have
   entertained a motion and would have set aside a conviction for the 261 counts as having
25  been – as not having jurisdiction relating to those, because the statute of limitations
   would have run.  But given that the jury, at the same time, was considering the 261 counts
26  and the allegations under 667.61 and delivered their verdict as to all of those, the Court
   finds that the rape counts, that the Court continued to have jurisdiction because it became,
27  potentially, a life case with the findings of the allegations.

28          So the defense request for a new trial because of the jurisdictional argument on the

1    statute of limitations is denied.

2    Exh. G, 22 RT 1090:20-1091:22.

3        White renewed this argument in his initial opening brief on direct appeal. However, he

4    subsequently withdrew the argument and submitted a supplemental opening brief without it. He

5    then raised the argument on state habeas corpus, claiming that his right under the Ex Post Facto

6    Clause of the federal constitution had been violated because he was charged with rape counts

7    2 and 4 after the six-year statute of limitations set forth at section 800 had expired. The claim

8    was denied summarily by the California Supreme Court.

9        2.   Legal Standard

10       In determining whether the state court's decision is contrary to or involved an

11   unreasonable application of clearly established federal law, or is based on an unreasonable

12   determination of the facts, a federal court looks to the decision of the highest state court to

13   address the merits of the petitioner's claims in a reasoned decision. LaJoie v. Thompson, 217

14   F.3d 663, 669 n. 7 (9th Cir. 2000). As noted, no state court issued a reasoned decision denying

15   White's statute of limitations claim. "Section 2254(d) applies even where there has been a

16   summary denial." Cullen v. Pinholster, 131 S. Ct. 1388, 1402 (2011). "Under §2254(d), a

17   habeas court must determine what arguments or theories supported or, as here, could have

18   supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

19   could disagree that those arguments or theories are inconsistent with the holding in a prior

20   decision of this Court." Harrington v. Richter, 131 S.Ct. 770, 786 (2011).

21       The United States Constitution prohibits the federal government and the states from

22   passing any "ex post facto Law." U.S. Const., Art. I, § 9, cl. 3 (federal government); Art. I, § 10,

23   cl. 1 (states). These clauses prohibit the government from enacting laws with certain retroactive

24   effects, including any law (1) that makes an act done before the passing of the law, which was

25   innocent when done, criminal; (2) aggravates a crime or makes it greater than it was when it was

26   committed; (3) changes the punishment and inflicts a greater punishment for the crime than the

27   punishment authorized by law when the crime was committed; or (4) alters the legal rules of

28   evidence and requires less or different testimony to convict the defendant than was required at

the time the crime was committed.  <u>Stogner v. California</u>, 539 U.S. 607, 611-12 (2003).  In applying the ex post facto prohibition to state laws, a federal court accepts the meaning ascribed to them by the highest court of the state.  <u>Murtishaw v. Woodford</u>, 255 F.3d 926,  964-65 (9th Cir. 2001).  But when their meaning is thus established, the issue of whether there has been an ex post facto violation is a constitutional question to be determined by the federal court.  <u>Id.</u> at 965.

### 3. <u>Analysis</u>

Although White claims an ex post facto violation, he does not support his claim with any facts or argument addressing the elements of such a claim.  As noted, the extension of a statute of limitations after the prior statute of limitations has expired can raise ex post facto concerns. <u>See</u> <u>Stogner</u>, 539 U.S. at 611-12.  White's argument, however, is not that California Penal Code section 799 – which places no time limit on certain prosecutions –  was extended to apply to him after the six-year statute of limitations set forth at section 800 had expired, and there is no support for such argument in the record.  Instead, White argues that the state court erred by finding that section 799 provided the appropriate statute of limitations in this case.

A state court's interpretation of state law binds a federal court sitting in habeas corpus. <u>Hicks v. Feiock</u>, 485 U.S. 624, 629 (1988).  The state's highest court is the final authority on the law of that state.  <u>Sandstrom v. Montana</u>, 442 U.S. 510, 516-17 (1979).  However, even a determination of state law made by an intermediate appellate court must be followed and may not be "'disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'"  <u>Hicks</u>, 485 U.S. at 630 n.3 (citation omitted).  In this case, the rejection of White's statute of limitations claim by the trial court and the California Supreme Court is consistent with California state law.  <u>See</u> <u>People v. Perez</u>, 182 Cal. App. 4th 231, 237-42 (2010) (discussing pertinent California Supreme Court case law and holding that the application of the alternate penalty scheme allowing for a life sentence under the "One Strike Law," Cal. Penal Code § 667.61, determines the applicable statute of limitations).

Moreover, even if the state court misapplied state law, the United States Supreme Court

1   has made clear that the federal writ of habeas corpus is unavailable for violations of state law

2   or for alleged error in the interpretation or application of state law.  See Swarthout v. Cooke, 131

3   S. Ct. 859, 861-62 (2011); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

4        Based on the above, the court finds that the record provides no support for White's claim

5   of an ex post facto violation.  Accordingly, the California Supreme Court's rejection of this

6   claim was not contrary to, or an unreasonable application of, clearly established federal law, and

7   this claim for habeas corpus relief is DENIED.

8

9   B.   Prosecutorial Misconduct

10       White asserts that the prosecution committed misconduct because it "withheld," or

11  committed "deliberate destruction or suppression," of two tape-recorded interviews, one with

12  victim Cheryl P. and one with White.  Pet'r Third Am. Pet. at 2.

13       1.   Background

14        As discussed above, Cheryl P. contacted Officer Kidd in March 1998, after spotting

15  White and identifying him as her assailant.  White was arrested.  Officer Kidd then conducted

16  separate taped interviews with Cheryl P. and White on March 30, 1998.  Exh. G, 8 RT 207.

17  While Officer Kidd was certain that the interview with White had been tape-recorded, he was

18  not sure what had happened to the tape by the time of trial.   Exh. G, 8 RT 208.  However, he

19  believed that the tape recording of the interview with Cheryl P. had been located.  Exh. G, 13

20  RT 643.

21       Before trial, the defense filed a motion to dismiss due to pre-arrest delay.  As the basis

22  for prejudice with regard to this motion, the defense argued that the loss of the tape recording

23  of the interview with White showed prejudice.  The trial court deferred decision on the motion

24  until after trial.  After trial, the motion was argued, and White once again argued that the loss

25  of the tape of his interview could have been significant because it could have allowed better

26  cross-examination. Exh. G, 16 RT 966.  The prosecution countered that the defense was fully

27  able to impeach based on the detailed notes of the interview made by Officer Kidd, which were

28  provided to the defense.  Exh. G, 16 RT 967.  In particular, Officer Kidd's notes documented

that White claimed that he did not rape Cheryl P., and that he was in fact out of town at the time. The prosecution also pointed out that, because White did not testify, the tape would have been inadmissible hearsay in any event. Exh. G, 16 RT 967. No mention of the Cheryl P. tape was made in White's argument for prejudice. The trial court ruled that, under the settled standard, it did "not believe that a sufficient showing of prejudice has been made here by the defense to shift the burden to the District Attorney to justify the delay." Exh. G, 16 RT 969.

White does not raise a claim of pre-trial delay in the instant petition, but argues, instead, that the prosecutor committed misconduct because the tapes of the interviews with Cheryl P. and with White were not available to him at trial.

### 2.   Legal Standard

As with White's ex post facto claim, no state court issued a reasoned decision denying White's claim of prosecutorial misconduct. Accordingly, this court "must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Harrington, 131 S.Ct. at 786.

The Supreme Court holds that the destruction of evidence is not a constitutional violation unless the evidence possesses apparently exculpatory value and comparable evidence is not reasonably available. See California v. Trombetta, 467 U.S. 479, 488–90 (1984). Additionally, the Court has held that if the evidence does not possess potentially exculpatory value, a constitutional violation is not established unless there is a showing of bad faith on the part of the police. See Arizona v. Youngblood, 488 U.S. 51, 58 (1988) ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

### 3.   Analysis

#### a.   Tape of Interview with Cheryl P.

White claims that the prosecution deliberately destroyed two tapes. With respect to the taped interview with Cheryl P, however, this assertion is directly contradicted by the record.

Notably, the defense never complained that the tape of the interview with Cheryl P. was missing, either during in limine proceedings or in post-trial motions.  Moreover, the record shows that on cross examination of Cheryl P., defense counsel actually used that tape recording to attempt to impeach her, and also asked whether she had read the transcript of the tape while she was listening to it, which question she answered in the affirmative.   Exh. G, 10 RT 422-43.  Accordingly, there is no merit to this claim.

       b.  Tape of Interview with White

   As noted, an allegation of the destruction of exculpatory evidence by the police does not require a showing of bad faith on their part to establish a constitutional violation, but if the evidence is not exculpatory a showing of bad faith is required.  Arizona v. Youngblood, 488 U.S. at 58.

   The record in this case does not support an inference that the tape of the interview was exculpatory.  Although defense counsel argued that the statement could have helped in White's alibi defense, the conclusive nature of the DNA match between White's reference sample and the sperm sample taken from Cheryl P. rendered such defense incredible.

   The record also does not support a finding that the inability to access the tape prejudiced White's defense.  Specifically, White was available to testify as to what he told Officer Kidd in the interview in 1998, as was Officer Kidd.  The record also shows that Officer Kidd took detailed notes of the interview, which were available and discovered to the defense. Exh. G, 16 RT 967.  Additionally, White, after his arrest in 2005, gave an interview in which he essentially repeated the details memorialized by Officer Kidd in his notes of the earlier interview. Exh. G, 16 RT 967-68.  Moreover, because White did not testify at trial, the interview tape could not have been admitted for any purpose.

   Finally, White alleges no facts to support the theory that Officer Kidd, or any other officer, intentionally destroyed the tape recording, and the record is devoid of any such fact.  The Ninth Circuit's ruling People of Territory of Guam v. Muna, 999 F.2d 397 (9th Cir. 1993), is instructive on this point:

Muna argues that his due process rights were violated by the failure of the police to preserve certain exculpatory evidence. Specifically, Muna asserts that his rights were violated because: (1) the police intentionally erased a tape recording of a short segment of his interrogation and attempted to conceal that fact, and (2) the police misplaced the filler photographs used in the allegedly suggestive photographic lineup.

We conclude that the police did not violate Muna's constitutional rights by failing to produce the specified evidence. Muna has not demonstrated that the failure of the police to produce this evidence was in bad faith. The only "evidence" of bad faith that Muna offers is the observation that both the photographs and the recording are missing. This is insufficient.

Id. at 400.

Based on the above, the court finds that White has failed to establish the intentional, bad-faith destruction of potentially exculpatory evidence by the police. Accordingly, the California Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law, and this claim for habeas corpus relief is DENIED.

C.     Insufficiency of the Evidence

White asserts that the evidence proffered at trial was insufficient to support the jury's verdict finding him guilty of kidnapping Kei C., because there was not substantial evidence that Kei C.'s fear that she would be harmed if she did not accompany him was objectively reasonable.

1.     Background

On direct appeal, the California Court of Appeal described the facts relevant to this claim as follows:

In December 1998, Victim, a 21-year-old Japanese tourist, was visiting San Francisco. Victim planned to travel to Los Angeles and went to the airport. However, before departing she decided to stay in San Francisco. When she arrived back in the city, she was unable to find lodging due to the late hour. Victim sat down and slept against a building at Market and Kearney. Around 2:00 a.m., a man tapped her shoulder to get her attention. The man tried to speak with her, but Victim could not understand, either because her English was not very good or because he was drunk, or both. The man left when the Victim did not respond to him, but returned two or three minutes later with appellant. Appellant was 5 feet 10 inches tall, 180 pounds, and roughly 40 years old.

Appellant tapped Victim's shoulder and asked her if she planned to sleep there. She understood him, and responded affirmatively in English. Appellant then told Victim that it was dangerous to sleep on that street, and that she should sleep at his place. Because appellant was a stranger, Victim rejected his offer. However, appellant did not relent, and asked Victim repeatedly with an increasingly harsh tone to come to his home.

18

Victim refused appellant's requests, whereupon appellant grabbed her by the arm and pulled her to her feet. At this point, Victim became very afraid and complied with appellant's demands to accompany him.

Both men walked with Victim for five to 10 minutes. Appellant's confederate then left without saying anything, leaving Victim alone with appellant. Victim was very afraid and wanted to run away, but feared that she would be unable to outrun appellant. She continued to walk with appellant for another 20 to 30 minutes, not knowing where he was taking her. As Victim testified, "... I was scared.... I felt I couldn't run away." Eventually appellant brought Victim to a parking lot where he beat, raped and robbed her.

Exh. D at 2-3.

White argued that the evidence was insufficient to support the jury's verdict that he kidnapped Kei C., because there was not substantial evidence that Kei C.'s fear that she would be harmed if she did not accompany him was objectively reasonable. The court of appeal rejected this claim, ruling as follows:

When faced with a sufficiency of the evidence claim, we must "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (People v. Johnson (1980) 26 Cal.3d 557, 578.) In so doing, we "'. . . presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.]" (Id. at ¶. 576-577.) If we find substantial evidence, the ruling is affirmed.

The only authority appellant cites to support his claim that Victim's fear was unreasonable is People v. Dagampat (1959) 167 Cal.App.2d 492 (Dagampat). In Dagampat, the 15-year-old victim was walking down the street when a group of three young men in a convertible accosted him. One of the men in the car, Valencia, exited and then entered a drugstore. The victim had recently witnessed one of the others in the car stab someone in a fight. The third person in the case, Dagampat, told the victim, "'Get into the car. I want to talk to you about the fight.'" (Id. at p. 493.) Valencia stepped out of the drugstore and stood behind the victim while the two men in the car gave him what he perceived as "'dirty looks.'" (Ibid.) At this point, the victim feared that he would be stabbed. The victim was never actually threatened, but after he entered the car he was driven to an alleyway and beaten. (Ibid.) The question in Dagampat was whether the victim entered the car because of a reasonable fear of harm, and the court held that the victim's fear was reasonable under the circumstances, upholding a conviction under section 207 for kidnapping. (Dagampat, at ¶. 494, 496.)

Appellant stresses that in Dagampat the victim had specific knowledge that one of the defendants had recently stabbed someone, while Victim had no prior knowledge of appellant. But in Dagampat, the court never asserted that such knowledge was necessary in order to have a reasonable fear. Indeed, Dagampat held that the "factors influencing [the victim's] decision [are] not to be analyzed separately, but as parts of a single indivisible transaction. The gravamen of the offense of kidnapping is some form of compulsion. [Citation.] The requisite force or compulsion need not consist of the use of actual physical force or of express threats; the taking is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he [or she] fears harm or injury from the accused, and his [or her] apprehension

is not unreasonable under the circumstances. [Citation.]" (<u>Dagampat</u>, <u>supra</u>, 167 Cal.App.2d at p. 495.) <u>Dagampat</u> noted that the victim was outnumbered with one member of the group behind him, the group wanted to talk about the stabbing he had witnessed, and the foreseen result of refusing the command was "a knife thrust into [his] ribs." (<u>Dagampat</u>, <u>supra</u>, 167 Cal.App.2d at p. 495.) The court reasoned that, based upon all of the factors influencing the victim, "It is difficult for us to see how it was unreasonable for [the victim] to fear harm that might come from his refusal to enter the car . . . ." (<u>Ibid.</u>)

While in the instant case Victim did not know appellant's past when he approached her, all of the factors influencing Victim, taken as a single indivisible transaction, show Victim's fear to be objectively reasonable.  Two men confronted her and one of the men appeared to be drunk.  Her back was up against a building, preventing escape.  Appellant strongly insisted that Victim accompany him to his "place," and, in order to encourage her to comply after she declined, he forced her to stand by grabbing her arm.  It was reasonable for Victim to fear harm from a pair of strangers accosting her at 2:00 a.m. with one insisting, in a harsh tone and with the use of physical force, that she come with them after she failed to comply.

People v. Majors (2004) 33 Cal.4th 321 (<u>Majors</u>) is instructive.  In <u>Majors</u> the defendant impersonated a mall security guard and told the female victim that she had to return to the mall with him because she was suspected of shoplifting.  The victim feared being arrested, even though she had not actually stolen any property.  Based upon that fear, the victim agreed to ride with the defendant back to the mall.  The defendant was unknown to the victim.  (<u>Id</u>. at p. 324.) The defendant did not "display any weapons, threaten, or touch" the victim, until the vehicle reached its destination.  (<u>Id</u>. at p. 325.) Once there, the defendant attempted to sexually assault the victim.  (<u>Ibid.</u>) The court determined that the victim's fear of harm was objectively reasonable.  (<u>Id</u>. at p. 331.) Relying in part on <u>Dagampat</u> (<u>Majors</u>, at p. 327), the court held, "if the defendant's conduct or statements cause the victim to believe that unless the victim accompanies the defendant the victim will be forced to do so, and the victim's belief is objectively reasonable," then the conduct or statements are sufficient to satisfy the force or fear element of section 207 (<u>Majors</u>, at p. 331).  The court concluded that, even without explicitly threatening the victim or using any physical force, the defendant's actions violated the victim's consent and constituted a kidnapping.  (<u>Id</u>. at p. 332.)

In the instant case appellant acted more egregiously than the defendant in <u>Majors</u>.  He used a harsh tone and physical force to compel Victim to come with him.  Victim reasonably feared that if she did not comply with appellant, she would be subject to harm, injury, or forced compliance.   Appellant had already pulled Victim to her feet by her arm.  At that point, it was objectively reasonable for her to believe that continued defiance would result in appellant's use of greater physical force against her.

Exh. D at 3-5.

2.   <u>Legal Standard</u>

The California Court of Appeal was the highest state court to issue a reasoned decision denying this claim.  Thus, the court looks to that decision to determine whether it was contrary to or an unreasonable application of clearly established federal law.  <u>LaJoie</u>, 217 F.3d at 669 n. 7.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A convicted individual who alleges that the evidence in support of his conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a claim for the violation of due process. See Jackson v. Virginia, 443 U.S. 307, 321 (1979). A court reviewing an insufficiency of the evidence claim does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). Instead, "the only question under Jackson is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality." Coleman v. Johnson, 132 S. Ct. 2060, 2065 (2012) (per curiam). The reviewing court may not substitute its judgment for that of the jury; "it is the responsibility of the jury — not the court — to decide what conclusions should be drawn from evidence admitted at trial." Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012) (per curiam) . Under Jackson, a jury's credibility determinations are entitled to near-total deference. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).

When a sufficiency of the evidence claim that was rejected in state court is reviewed on federal habeas corpus, it is subject to a "twice-deferential standard." Parker, 132 S. Ct. at 2152. First, relief must be denied if, viewing the evidence in the light most favorable to the prosecution, there was evidence on which "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Jackson, 443 U.S. at 324). Second, the court must apply 28 U.S.C. § 2254(d)(1) to the state court's decision and determine whether its application of Jackson was objectively unreasonable. Id.

The Jackson standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16. However, "the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman, 132 S. Ct. at 2064.

    3.    Analysis

The California Court of Appeal described the "force" element of the crime of kidnapping

21

as follows:

> The gravamen of the offense of kidnapping is some form of compulsion. The requisite force or compulsion need not consist of the use of actual physical force or of express threats; the taking is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he [or she] fears harm or injury from the accused, and his [or her] apprehension is not unreasonable under the circumstances.

Exh. D at 4 (internal brackets , quotation and citation omitted).

Viewing the evidence presented to the jury in the light most favorable to the prosecution, the court finds there was substantial evidence from which any rational trier of fact could have found, beyond a reasonable doubt, that Kei C.'s fear that White would use force against her if she refused to accompany him was objectively reasonable. Additionally, the state court applied the proper standard of review to White's sufficiency of the evidence claim, and its rejection of that claim was neither contrary to nor an unreasonable application of Jackson. Accordingly, this claim for habeas corpus relief is DENIED.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). White may seek a certificate of appealability from the Ninth Circuit Court of Appeals. The clerk shall enter judgment in favor of respondent, and close the file.

This order terminates docket no. 63.

IT IS SO ORDERED.

DATED: June 21, 2013

_____
SUSAN ILLSTON
United States District Judge